# Exhibit 1

# Agency Services Agreement

# Exhibit 1



**AGENCY SERVICES AGREEMENT**

THIS AGENCY SERVICES AGREEMENT (hereinafter "**Agreement**") is made and entered as of **October 28, 2022** (hereinafter the "**Effective Date**"), by and between **TOP MEDIA, LLC**, a Nevada company (hereinafter "**TOP**") and **LOGE CAMPS LLC**, a Washington company (hereinafter **"Client"**).

Client wishes to obtain marketing services from TOP and TOP wishes to provide these marketing services to Client. Now, therefore, in exchange for mutual consideration, the sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.  **Services**

    (a) TOP shall provide the services and materials set forth in the statement of work attached as Exhibit A-1 and such other services and materials as may be mutually agreed to by TOP and Client from time to time pursuant to written statements of work executed by the parties (the "**Services**" and "**Materials**"). Exhibit A-1 and each additional statement of work executed by the parties pursuant to this Agreement shall be individually referred to herein as a Statement of Work ("**SOW**") and shall be incorporated herein by reference. Any capitalized terms not defined in a Statement of Work shall have their respective meanings as set forth in this Agreement.

    (b) Each Statement of Work shall set forth: (i) the Services to be performed and Materials to be provided by TOP; (ii) any applicable deadlines and delivery dates for the Services and Materials; and (iii) the costs, fees and payment schedule with respect to such Services and Materials.

    (c) Any modifications to the Services as set forth in the applicable Statement of Work shall be subject to the prior mutual written agreement of the parties. To the extent of any conflicting provisions in this Agreement and a Statement of Work, the provisions within this Agreement shall supersede, unless the Statement of Work references the Section(s) of the Agreement to be superseded by the Statement of Work, in which case the Statement of Work shall control with respect to the conflicting provision. Any "goals" or "benchmarks" that may be included in this Agreement and/or a specific Statement of Work are intended solely for the purpose of helping define what Client considers to be a highly positive outcome and both parties agree that TOP is in no way guaranteeing that the specific outcome will occur.

(d) Client acknowledges that each Statement of Work is a single contract period for which TOP shall plan, strategize, and assume financial risks at the onset for the entire SOW contract period, including but not limited to investing in tangible and intangible assets for the benefit of the Client. Any billing periods specified in a Statement of Work are only for the convenience of the Client.

**2.    Compensation and Reimbursement of Costs**

(a) In consideration for TOP rendering the Services and providing the Materials, Client shall pay TOP all fees and expenses set forth in the applicable Statement of Work.

(b) In the event that additional third-party charges (i.e., messenger service fees, shipping, copying/binding, travel, etc.) become necessary in the performance of the Services, TOP shall receive written approval from Client prior to incurring any such charges. Payment by Client for third-party charges shall be due upon receipt of invoice from TOP.

(c) Client shall make payment to TOP based upon the terms specified in each Statement of Work. All wire transfer fees and/or currency conversion fees are to be paid by Client and not deducted from proceeds. Due to its higher efficiency, payment shall be made via electronic funds transfer, wire service, or other comparable electronic method. In the event that TOP elects to accept a physical check on a case-by-case basis, checks shall be made payable to "TOP" and sent via overnight mail or deposited directly into TOP's bank account. Credit card processing requires advance written approval by TOP and is billed at an additional 3.75% percent fee.

(d) Any balance that remains unpaid more than five (5) days from the Client due date under this Agreement or any applicable Statement of Work shall incur a penalty equal to two (2) percent of the balance outstanding per calendar month (or portion thereof) from the date that payment should have been received. If any payment is more than 10 days past due, TOP shall suspend services until payment is made.

**3.    Term and Termination**

(a) The term of this Agreement shall commence as of the Effective Date and shall continue until December 31, 2023. This Agreement shall automatically renew for

additional one-year terms thereafter unless terminated as set forth below.

(b) Client may terminate this Agreement and/or any Statement of Work hereunder upon 60 (sixty) days' advance written notice to TOP (hereinafter "Advance Notice Period").  If Client terminates this Agreement pursuant to this Section 3(b), or if TOP terminates this agreement because of Client's material breach pursuant to Section 3(d), all payments due under this Agreement (including all future payments specified in a Statement of Work) shall immediately become due in full.

(c) TOP may terminate this Agreement upon 60 (sixty) days' advance written notice to Client, in which case TOP shall return any monies paid for work not yet completed, but TOP shall have no further obligation or liability with respect to any work under this Agreement.

(d) Either party may terminate this Agreement for cause in the event the other party breaches a material provision of this Agreement and does not cure such breach within 30 (thirty) days of the non-breaching party's written notice thereof (hereinafter "Notice to Cure").  To be considered a Notice to Cure, the notice must (1) be delivered both electronically and via registered mail, (2) be labeled or titled with the words "Notice to Cure" in the subject line or reference line, (3) reference the specific paragraph of the Agreement and/or Statement of Work that is in breach, (4) specify the reasonable conditions by which the breach shall be considered cured, and (5) specify the start date and end date of the cure period (hereinafter "Cure Period").  Notwithstanding the foregoing, non-payment by Client shall be governed by Section 2(d).

4. **Additional Responsibilities**

(a) Client recognizes that TOP has ongoing relationships with third-party organizations and contacts that are important to TOP's business operations. Client agrees to respond in a timely fashion to questions TOP receives from these third-party contacts related to TOP's Services and Materials under this Agreement.  Client acknowledges that failing to respond to these questions in a timely fashion could affect TOP's ability to render the Services and Materials specified in this Agreement. For the purpose of this Section, "timely fashion" means within two (2) business days from the time of submission by TOP.

(b) Client agrees to respond in a timely fashion to TOP's inquiries and requests for feedback.  Client understands and acknowledges that failing to respond in a timely fashion would prevent TOP from performing its obligations under this

Doc ID: 4b8e707404bc67cca4188462afa02de0ea71fe64

Agreement. For the purpose of this paragraph, "timely fashion" means within two (2) business days from the time of submission by TOP.

(c) Client and its officers, directors, members, managers, agents, and employees (as applicable) shall not disparage any specific media outlets, journalists, TOP, or TOP officers, directors, agents, or employees in any public or private forum, or otherwise take any action which could reasonably be expected to adversely affect the reputation of TOP or the personal or professional reputation of any of TOP's officers, directors, agents or employees.

(d) Client agrees to not solicit or work directly with persons who are current employees or contractors of TOP or who have been employed or contracted by TOP within one year prior to the onset of the solicitation or direct working relationship. Should Client hire, solicit, or engage a current employee or contractor of TOP or an employee or contractor whose employment or engagement with TOP ended within one year of the onset of Client hiring, soliciting or engaging said employee or contractor, Client agrees to immediately pay TOP an amount equal to 50% of the market rate annual compensation for the position (as determined by salary.com, 50th percentile, at the date of hire) regardless of the duration of employment or engagement or whether the person is employed or engaged on a permanent or temporary basis. This clause shall not prohibit Client from hiring any person who responds to a general advertisement or solicitation on their own, provided the general advertisement or solicitation does specifically target employees or contractors of TOP.

(e) Nothing in the preceding paragraphs prohibits either party from testifying truthfully in any valid judicial process.

5.   **Service-Specific Responsibilities**

If the following services are included in any specific Statement of Work, the following additional terms shall apply:

(a) *Public Relations (including Always-On PR and Rapid Response Program)* Client agrees that failing to provide necessary PR inputs to TOP in a timely fashion (including interview availability, media interview spokespeople, internal Client data necessary for PR pitches, or any other necessary inputs) would prevent TOP from performing its obligations under this Agreement. Client acknowledges that securing PR placements is a time-sensitive discipline and that PR placements may be lost and rendered unrecoverable if Client does not respond to requests from journalists delivered by TOP in a timely fashion (same day response is preferred but in no event longer than two calendar days). Client

Doc ID: 4b8e707404bc67cca4188462afa02de0ea71fe64

further acknowledges that PR by its nature is an "earned" marketing discipline in which results may vary due to unique circumstances (including but not limited to breaking national or international news that pre-empts other news).  The parties further agree that placement in any specific media outlet, or any specific quantity or quality of periodic or total media placements, cannot be guaranteed.

(b) *Influencer Marketing*
Client agrees that failing to provide necessary influencer marketing inputs to TOP in a timely fashion (including product samples, posting guidelines or guardrails, visual assets, or any other necessary inputs) would prevent TOP from performing its obligations under this Agreement.  Unless otherwise specified in a Statement of Work, Client shall be responsible for actually mailing sample products or other physical items (hereinafter "Client Influencer Kit") to influencer contacts based on the instructions of TOP.  Furthermore, Client shall be responsible for all costs associated with producing and mailing the Client Influencer Kit.  Both parties agree that if Client does not mail the Client Influencer Kit in a timely fashion (defined as within 5 calendar days from request by TOP), then TOP shall not be held responsible for posting delays.

(c) *Branding*
Client agrees that failing to provide necessary brand inputs to TOP in a timely fashion (including access to key stakeholders, key brand graphical assets, essential product information, or any other necessary inputs) would prevent TOP from performing its obligations under this Agreement.

(d) *Copywriting*
Client agrees that providing "one voice" feedback for copywritten content is critical to the revision process.  Client acknowledges that failing to provide feedback in a timely fashion, or providing contradictory feedback from multiple individuals who are Client stakeholders, would prevent TOP from completing its copywriting work in accordance with planned schedules.

5. **<u>Indemnification and Attorney Fees</u>**

(a) Client agrees to indemnify, defend, and hold TOP harmless from and against any and all claims, losses, damages, liabilities, costs and expenses, including, without limitation, legal expenses and reasonable attorney fees, arising out of any claim based upon or relating to information or documents supplied by Client to TOP pursuant to this Agreement.

Doc ID: 4b8e707404bc67cca4188462afa02de0ea71fe64

(b) In any action brought to enforce any provision of this Agreement, the losing party will pay the prevailing party's reasonable attorney fees and costs.  An award of attorney fees shall include attorney time spent in the process of attempting collection prior to litigation.  The parties acknowledge that each has been represented by counsel in the negotiation and execution of this Agreement.  Accordingly, the preceding sentence, which provides for attorney fees and costs, applies only to the compensation provisions of the Agreement (set forth in Paragraph 2, "Compensation and Reimbursement of Costs," and the "Payment Terms" section of each applicable Statement of Work) and to no other provision.

**6.   Additional Terms**

(a) This Agreement, together with each Statement of Work entered into pursuant to this Agreement, sets forth the entire understanding between the parties hereto, and supersedes and replaces all prior or contemporaneous oral or written agreements between the parties concerning the matters contemplated in this Agreement.  This Agreement may not be amended, modified or extended in any way by either party without the written agreement of other party.

(b) No waiver, by either party, whether express or implied, of any provision under of this Agreement or of any breach or default of the other party (or any related remedy), shall constitute a waiver of any other provision of this Agreement or prevent such party from enforcing any provision of this Agreement or from seeking a remedy as to any subsequent breach or default.  No failure or delay by either party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, or privilege preclude any other or further exercise thereof.

(c) The relationship of the parties for this Agreement is that of independent contractors.  Nothing contained in this Agreement shall be deemed to constitute either party as the agent or representative, or employer or employee, of the other party, or both parties as joint venturers or partners for any purpose.

(d) In no event shall TOP or its officers, directors, employees, affiliates or agents be liable for any indirect, incidental, special, punitive, exemplary or consequential damages, including but not limited to lost profits and speculative damages.

(e) The parties agree that Client is receiving pricing based on the presumption of on-time payments.  In the event that Client makes 3 (three) consecutive late payments, or is more than 90 (ninety) days late in any specific payment, TOP reserves the right to rescind any special discount pricing or other benefits that

may have been offered Client (hereinafter "Discounted Rates") and Client shall be re-billed a revised amount due immediately based on standard rates (hereinafter "Standard Rates") for the Services or Materials provided as defined in any relevant Statement of Work.

(f) This Agreement is the result of negotiations between the parties and has been reviewed by each of the parties hereto and their respective counsel, if any. Accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(g) TOP may assign this Agreement, without prior written consent, to any corporation or other entity "assignee" with or into which TOP may hereafter merge or consolidate or to which TOP may transfer all or substantially all of its assets, including but not limited to an entity with substantially the same ownership structure as TOP. The assignee shall assume all obligations of TOP hereunder as fully as if it had been originally made a party to the Agreement.

(h) This Agreement (and any dispute arising from the relationship between the parties to this Agreement) shall be governed by Nevada law. Any dispute that arises under or relates to this Agreement shall be resolved in the state and federal courts within Clark County, Nevada.

(i) The provisions relating to indemnification, non-disparagement, and attorney fees shall survive the termination of this Agreement.

**LOGE CAMPS LLC**

By: *Cale Genenbacher*

Name: Cale Genenbacher

Title: CEO

Date: 11 / 09 / 2022

**TOP MEDIA, LLC**

By: *Br Kh*

Name: Benjamin Kaplan

Title: CEO

Date: 11 / 09 / 2022

Doc ID: 4b8e707404bc67cca4188462afa02de0ea71fe64

## EXHIBIT A-1

## STATEMENT OF WORK:
## 2022-2023 PR SERVICES

This statement of work for 2022-2023 PR Services (hereinafter "Statement of Work") is hereby incorporated into the Agency Services Agreement dated **October 28, 2022** (hereinafter "Original Agreement") by and between **TOP MEDIA, LLC** (hereinafter "TOP" or "Company") and **LOGE CAMPS LLC** (hereinafter "Client").

## Scope of Work

TOP shall provide PR services on behalf of the Client's LOGE brand and individual LOGE properties.

## Campaign Duration

Work shall commence on **November 1, 2022** and conclude on **October 31, 2023** (hereinafter "Initial Contract Period").

After the Initial Contract Period, this Statement of Work shall continue on a month-to-month basis until Client delivers written notice to TOP at least 60 (sixty) days in advance of the next monthly start date (hereinafter "Monthly Start Date") that it wishes to suspend PR services in that month and thereafter. Each Monthly Start Date shall occur on the **1st** day of the month.

Client acknowledges that this advance notice before the suspension of services is necessary because PR placements often take 90 days or longer to complete and TOP has significant relationships with media outlets and journalists that would be damaged without adequate transition time.

## Services

### A. Always-On PR

TOP shall conduct a U.S. PR program that seeks to gain coverage for Client in online, print, and broadcast media outlets. To do this, TOP shall approach media gatekeepers with timely and newsworthy ideas for articles, interviews, and blog posts.  TOP shall present Client with recommended stories to be pitched. Pitches shall promote multiple new properties, already-launched properties, and the LOGE brand as a whole — including the founding team, specific acquisitions, and the founding story.  A special

Doc ID: 4b8e707404bc67cca4188462afa02de0ea71fe64

emphasis shall be placed on stories that position Client for future fundraising activity with investors on favorable terms.

### B. Rapid Response PR

TOP shall monitor industry mentions of keyword topics in order to identify strategic opportunities for Client to respond and participate in the ongoing media narrative. TOP will then respond to the most promising opportunities to convert them into Client coverage or awareness with journalists. TOP shall provide periodic reporting to Client of these strategic opportunities and the overall media coverage landscape.

### C. Property-Specific Launch PR

TOP shall conduct a PR program for individual Client properties that are scheduled to launch (hereinafter "Featured Property" or collectively as "Featured Properties").  The following Featured Properties shall be included under this Statement of Work:

- Alta Crystal (Washington):  November 2022
- South Fork (Colorado): January 2023
- Taos (New Mexico):  April 2023
- Westport (Washington): May 2023
- St. George (Utah):  May/June 2023
- Missoula (Montana): June/July 2023
- West Dover (Vermont): October 2023
- Crystal Mountain (Washington): November 2023
- Essex (Montana): November 2023

Property-Specific Launch PR work shall start approximately 1 (one) month prior to opening day.  This PR program shall include invitations to visit to travel journalist and bloggers, invitations to visit to related journalists and bloggers who cover topics like outdoors sports and lifestyle, location-specific trend + data PR stories, and stories on the positive experience of initial property guests.  Client shall provide an adequate number of complimentary Featured Property room stays for journalists and bloggers who wish to publish stories about or review each Featured Property.

Any others properties other than the ones listed above shall be considered outside of scope of this statement of work and shall be covered by a separate statement of work for launch PR at a cost of $21,000 per property.

### Payment Terms

Client shall pay **$365,000 USD** (three hundred and sixty-five thousand U.S. dollars) to TOP for work during the Initial Contract Period.

9

Payment shall be assigned as $10,500 USD per month for the first 2 (two) months of Always-On PR and Rapid Response PR at a special Introductory Rates, $15,500 USD per month for 10 (ten) months Always-On PR and Rapid Response PR at Discounted Rates, and $21,000 USD per property for Property-Specific Launch PR for a total of 9 (nine) Featured Properties at Discounted Rates. The parties acknowledge that during the Initial Contract Period, Client is receiving special Discounted Rates that have been reduced from TOP's $20,000 USD per month (Always-On PR and Rapid Response PR) and $30,000 per property (Property-Specific Launch PR) Standard Rates.

Payment shall be made as follows:

- Payment 1 (via electronic transfer): **$61,000 USD** due on October 31, 2022.
- Payment 2 (via electronic transfer): **$61,000 USD** due on December 1, 2022.
- Payment 3 (via electronic transfer): **$61,000 USD** due on January 1, 2023.
- Payment 4 (via electronic transfer): **$61,000 USD** due on February 1, 2023.
- Payment 5 (via electronic transfer): **$61,000 USD** due on April 1, 2023.
- Payment 6 (via electronic transfer): **$60,000 USD** due on June 1, 2023.

For any payments executed via physical checks on a case-by-case basis if approved by TOP, Client shall send physical checks via overnight mail so that the check is received by TOP on or before the payment due date. Checks shall be made payable to "TOP Media, LLC."

All wire transfer fees and/or currency conversion fees are to be paid by Client and not deducted from proceeds by Client's bank.

IN WITNESS WHEREOF, the parties hereto have executed this Statement of Work, which is to be incorporated into the Agency Services Agreement.

**LOGE CAMPS LLC**

By: *Cale Genenbacher*

Name: Cale Genenbacher

Title: CEO

Date: 11 / 09 / 2022

**TOP MEDIA, LLC**

By: *Bn Kh*

Name: Benjamin Kaplan

Title: CEO

Date: 11 / 09 / 2022

Doc ID: 4b8e707404bc67cca4188462afa02de0ea71fe64


Audit Trail

| | |
|---|---|
| **TITLE** | LOGE <> TOP PR Agreement |
| **FILE NAME** | TOPMedia_LOGECamps_PR_MSA+SOW-v4.pdf |
| **DOCUMENT ID** | 4b8e707404bc67cca4188462afa02de0ea71fe64 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

**SENT**  **11 / 04 / 2022**  Sent for signature to Cale Genenbacher (cg@logecamps.com)
11:27:54 UTC  and Benjamin Kaplan (ben.kaplan@topagency.com) from
ben.kaplan@benkaplan.org
IP: 73.170.54.164

**VIEWED**  **11 / 09 / 2022**  Viewed by Cale Genenbacher (cg@logecamps.com)
12:52:56 UTC  IP: 68.47.187.184

**SIGNED**  **11 / 09 / 2022**  Signed by Cale Genenbacher (cg@logecamps.com)
12:54:12 UTC  IP: 68.47.187.184

**VIEWED**  **11 / 10 / 2022**  Viewed by Benjamin Kaplan (ben.kaplan@topagency.com)
05:35:44 UTC  IP: 70.125.105.245

**SIGNED**  **11 / 10 / 2022**  Signed by Benjamin Kaplan (ben.kaplan@topagency.com)
05:45:54 UTC  IP: 70.125.105.245

**COMPLETED**  **11 / 10 / 2022**  The document has been completed.
05:45:54 UTC

Powered by HELLOSIGN